UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| APRIL DIANE MCPETERS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRYANT LAMONT THOMAS, in his individual )<br>capacity and in his official capacity as a Probation )<br>and Parole Officer with the Tennessee Department )<br>of Correction Probation and Parole Division, )<br>)<br>Defendant. ) | No. 3:18-CV-39-CLC-HBG |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 55] of referral by the District Judge.

Now before the Court is Plaintiff's Application for Default Judgment Against Defendant Bryant Lamont Thomas ("Application") [Doc. 54]. On December 3, 2020, the Court entered a Show Cause Order [Doc. 56], directing Defendant to appear before the undersigned on January 6, 2021, to show cause as to why a default judgment should not be entered against him. The Court addressed Plaintiff's Application on January 6, 2021. Attorney Benjamin Aaron appeared on behalf of Plaintiff. Defendant did not appear. The Court heard testimony from Plaintiff, Sena McPeters, and Ann Coria. Accordingly, for the reasons more fully explained below, the Court **RECOMMENDS** that Plaintiff's Application [**Doc. 54**] be **GRANTED IN PART AND DENIED IN PART.**

1

I.   **BACKGROUND**

The Complaint in this matter was filed on February 1, 2018, against a number of Defendants, all of whom have been dismissed except Defendant Bryant Thomas.[1]  Relevant to the instant matter, the Complaint states that Plaintiff was on probation after pleading guilty to a charge of food stamp fraud.  [*Id.* at ¶ 16].  For approximately five years, she complied with the conditions of her probation and lived under the supervision of her probation officer without incident.  [*Id.* at ¶ 17].  In late 2016, Plaintiff was assigned a new probation officer, Defendant Thomas.  [*Id.* at ¶ 18].  The Complaint states that Defendant used text messages to check on Plaintiff's efforts to obtain work, but after two-in person visits, Defendant's text messages became informal and conversational.  [*Id.* at ¶ 21].

The Complaint alleges that in February 2017, Plaintiff went to Defendant's office for her third check-in, but he was not available.  [*Id.* at ¶ 22].  Shortly thereafter, Defendant called Plaintiff on her cell phone and stated that he was conducting home visits instead of office check-ins.  [*Id.* at ¶ 23].  From that point onward, Defendant's text messages to Plaintiff became harassing and exploitative.  [*Id.* at ¶ 24].  For instance, Defendant asked Plaintiff inappropriate personal questions and requested pictures of Plaintiff, including sexually explicit pictures.  [*Id.*].

The Complaint states that Defendant demanded that he visit with Plaintiff at her house and that Plaintiff had no choice but to accede.  [*Id.* at ¶ 26].  When Defendant arrived at Plaintiff's home, he was wearing his probation and parole officer badge and had his pistol on his belt.  [*Id.* at ¶ 27].  Defendant placed his hand on his pistol and walked through Plaintiff's entire house, checking to make sure there were no witnesses present.  [*Id.* at ¶ 28].  Defendant pushed close to Plaintiff and whispered orders to show him pictures of her.  [*Id.* at ¶ 29].  The Complaint alleges

---

[1] Plaintiff does not mention the official capacity claim against Defendant, but as the District Judge explained, "Neither a state nor a state actor in his or her official capacity is a 'person' subject to a suit for damages under § 1983."  [Doc. 39 at 12].

that frightened and alone, Plaintiff complied with Defendant's request and showed him pictures. [*Id.*]. Defendant then forced Plaintiff to delete many of the text messages that they had exchanged. [*Id.*]. The Complaint states that with his hand on his gun, Defendant ordered Plaintiff to perform oral sex on him. [*Id.* at ¶ 30]. The Complaint alleges that in fear of her life and liberty, and under the compulsion of Defendant's exercise of his official authority, Plaintiff complied with his command. [*Id.* at ¶ 31]. Plaintiff alleges violations of her civil rights, pursuant to 42 U.S.C. § 1983, and assault and battery against Defendant.

On March 28, 2019, the Court granted Defendant's motion to stay this case pending resolution of the criminal case against him. [Doc. 41].[2] On July 16, 2020, the Court lifted the stay and directed Defendant to respond to the Complaint within twenty-one (21) days. Defendant did not respond to the Complaint, and therefore, Plaintiff moved for entry of default. [Doc. 51]. The Clerk entered a default on September 22, 2020. [Doc. 52]. The instant Motion followed.

## II. POSITIONS OF THE PARTIES

Plaintiff's Application seeks a default judgment against Defendant in an amount of no less than $10 million in compensatory damages and $15 million in punitive damages. In support of her request, Plaintiff submitted a Declaration discussing the events that occurred. [Doc. 54-1]. In addition, Plaintiff submitted a Declaration of Sena McPeters [Doc. 54-2], Plaintiff's mother, and a certified copy of Defendant's criminal judgment from Anderson County Circuit Court, showing that Defendant was convicted of violating Tennessee Code Annotated § 39-16-409, a Class E felony. [Doc. 54-3].

---

[2] At the time of filing the motion to stay, Attorney John Barnes made a special, limited appearance on behalf of Defendant for the sole purpose of requesting that the case be stayed. [Doc. 24] Attorney Barnes represented Defendant in his criminal matter but withdrew from the instant case on April 3, 2020. [Doc. 47].

3

Plaintiff submits that the allegations in the Complaint are sufficient to establish Defendant's liability with respect to Plaintiff's civil rights claim and the assault and battery claim. Further, Plaintiff concludes that she is entitled to compensatory and punitive damages and a reasonable attorney's fee.

## III. TESTIMONY

During the hearing, the following individuals testified: Plaintiff, Sena McPeters, and Ann Coria. The Court will summarize their testimonies in the order in which they were presented at the hearing.

### A. Plaintiff

Plaintiff testified that she began probation in 2012 for food stamp fraud. She testified that between 2012 and 2017, during the time she was probation, she had her rights restored, obtained employment, and got her children back. She stated that she was "clean" during that time with no probation violations. She rented a house from her parents. She stated that at the end of 2016, Defendant became her probation officer.

Plaintiff stated that she initially met with Defendant at his office once every three months. She testified that Defendant began sending her text messages asking how she was doing and requesting pictures. Plaintiff told Defendant to go to her Facebook page for pictures, and he told her that he did not have a Facebook account. Plaintiff stated Defendant began asking for sexually explicit pictures and that she complied with his request because Defendant could put her in jail if she did not comply.

Plaintiff testified that her previous probation officers never entered her home. Plaintiff explained they simply pulled in the driveway and waved to make sure Plaintiff was home. Plaintiff testified that when Defendant performed his at home visit, he came straight into her home. Plaintiff stated that Defendant checked the entire house to see if anyone else was there. Plaintiff testified

4

that Defendant was wearing his parole badge and had his handgun on him. Defendant told Plaintiff to delete all the text messages that they had exchanged, and Plaintiff complied. Plaintiff testified that Defendant stood in her walkway and asked her to come to the walkway. Plaintiff said no three times. Plaintiff testified that Defendant's pants were undone, and his penis was out. Plaintiff stated that it was a nightmare, and she cannot remember exactly what was said. She testified that she was "scared to death" and that she did not want to go to the walkway because she knew what Defendant wanted. Plaintiff testified that she performed oral sex on Defendant because he had a gun and control over her freedom.

Plaintiff testified that afterwards, Defendant told her that she did not have to worry about paying fines. Prior to the above encounter, Defendant told Plaintiff he could lock her up if she did not pay her fines. Plaintiff testified that her dad arrived in the driveway and that Defendant spoke to him and then left. Plaintiff never saw Defendant again. Plaintiff testified that she did not report the above incident to the District Attorney's Office. Instead, Plaintiff told a friend, and the friend reported the above incident.

Plaintiff stated that the incident occurred in February 2017. She does not recall the specific date because she has tried to block out the incident. Plaintiff testified that she was traumatized, she could not sleep, and she almost had a nervous breakdown. She testified that she sought medical treatment for her mental distress. *See* [Ex. 1] (Plaintiff's medical records). Specifically, Plaintiff's medical records show that she visited the emergency room at Methodist Medical Center ("Methodist Center") on February 9, 2017, where she reported that she had been raped by a police officer at gun point. [Ex. 1]. Plaintiff stated that when she went to Methodist Medical, she was hysterical and that she was shaking, crying, and yelling. The providers had to sedate Plaintiff at the hospital. Plaintiff's medical records show that the providers at t Methodist Medical prescribed her medicine for anxiety. [Ex. 1]. Plaintiff also sought mental health treatment with Cherl Sweet,

5

a nurse practitioner, who assessed an acute stress reaction, and Dr. Schaid, who treated Plaintiff for symptoms of acute post-traumatic stress. [Ex. 1].

Plaintiff testified that after the incident, she relapsed with drugs, explaining that the ordeal was more than she could handle. She testified that the same people that she reported the incident to charged her with possession of methamphetamines. She explained that she "was a mess." Plaintiff testified that she lost everything. For instance, Plaintiff stated that she was evicted from and that her family could not help because her drug use became too much. She stated that she lost all her possessions and that she had nowhere to go. Plaintiff testified that her parents stopped speaking to her and that she lost her rights with respect to her children. Plaintiff explained that the Department of Children's Services got involved and that Plaintiff could not visit with her children.

Plaintiff testified that, currently, she is doing good and that she is working on her relationship with her children. She testified that she now lives with her parents and has been "clean" for nine months. Plaintiff testified that had the incident not happened, she would not have relapsed.

### B. Sena McPeters

Sena McPeters ("McPeters"), Plaintiff's mother, testified telephonically.[3] McPeters testified that prior to the incident, Plaintiff was "doing wonderful." McPeters stated that Plaintiff maintained full-time employment, was able to get a car and purchase insurance, and had rights to her children. McPeters testified, "We did a lot together as a family." McPeters stated that Plaintiff rented a house from McPeters and McPeters's husband.

McPeters testified that after 2017, Plaintiff became depressed, angry, and was filled with rage. McPeters did not know what to do. She testified that Plaintiff "fell apart." McPeters stated

---

[3] The Court permitted Sena McPeters's testimony via telephone because she has cancer and her doctor advised her not to travel anywhere unless she had to travel for treatment. In addition, McPeters's testimony via telephone was not challenged. *See* Fed. R. Civ. P. 43(a).

6

that she and her husband had to evict Plaintiff because the neighbors complained that Plaintiff had visitors coming in and out and that Plaintiff was taking drugs. McPeters explained that she and her husband had to cut ties with Plaintiff because Plaintiff became confrontation. McPeters testified that Plaintiff also became secluded and that her relationship with her children was damaged.

McPeters stated that about a year after the incident, she and Plaintiff re-established their relationship and that Plaintiff currently lives with McPeters. McPeters testified that Plaintiff is doing 100% better and that she is talking about going back to school. McPeters testified that Plaintiff wants to support herself and that she is working on re-building her relationship with the family. McPeters testified, however, that she does not think that Plaintiff will ever be the same as she was before the incident. McPeters stated that she sees Plaintiff "rocking a lot" and that Plaintiff never did that before the incident.

### C. Ann Coria

Ann Coria ("Coria") testified that she is a public defender and has represented Plaintiff for several years. Coria testified that she saw Plaintiff in the grocery store before the incident and that Plaintiff looked healthy. Plaintiff told Coria that she got her children back and was doing great. Coria testified that after the incident, she was appointed to represent Plaintiff for violating probation and possessing methamphetamines. Coria stated that Plaintiff was not the same person that Coria saw in the grocery store. Coria explained, "Something had changed." Coria testified that she later became aware of Plaintiff's allegation regarding the incident. Coria stated that she reviewed her records, which showed that Plaintiff had no charges from 2012 to 2017.

Coria stated that later Plaintiff had a dirty drug screen and was placed on probation with the same office that was the original problem. Coria stated that afterwards, she was able to arrange

7

for Plaintiff to report to community corrections instead of the probation office. Coria testified that Plaintiff was different after the incident.

## IV. ANALYSIS

The Court has considered Plaintiff's Application and the exhibits attached thereto, along with the testimony presented at the hearing. Accordingly, for the reasons stated below, the Court **RECOMMENDS** that Plaintiff's Application [**Doc. 54**] be **GRANTED IN PART AND DENIED IN PART.**

The Court will first discuss the standard with respect to default judgments pursuant to Rule 55 and then turn to Plaintiff's requested amount of damages and attorney's fees.

### A. Rule 55

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Following the entry of default, a party may apply for default judgment, and the Court may conduct a hearing – if needed, to perform an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter – prior to entering default judgment. Fed. R. Civ. P. 55(b). "Once the Clerk has entered a default against a defendant, the Court must treat all well-pleaded allegations in the Complaint as true." *AF Holdings LLC v. Bossard*, 976 F. Supp. 2d 927, 929 (W.D. Mich. 2013) (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (entry of default judgment "conclusively establishes every factual predicate of a claim for relief")).

In the present matter, the Clerk entered a default against Defendant on September 22, 2020. [Doc. 52]. The undersigned ordered [Doc. 56] Defendant to appear before the Court on January 6, 2021, to show cause as to why a default judgment should not be entered. Defendant failed to attend the January 6 hearing. Accordingly, the Court **RECOMMENDS** that a default judgment

8

be entered against Defendant.

Taking as true the allegations in the Complaint [Doc. 1], the Court **INCORPORATES BY REFERENCE** the allegations set forth by Plaintiff against Defendant. The Court accepts all such allegations, and specifically, the Court **FINDS**, based upon entry of default, that Defendant violated 42 U.S.C. § 1983 and committed assault and battery.

The Court will now turn to the amount of damages that Plaintiff has requested.

### B. Damages

As mentioned above, Plaintiff requests $10 million in compensatory damages and $15 million in punitive damages. In support of her request, Plaintiff states that she was traumatized and humiliated. In addition, Plaintiff states that she was later subjected to a surprise home visit by two male officers and increasingly strict supervision. Plaintiff states that after the incident, she could not maintain regular employment or remain drug free and that she was sent to jail. Plaintiff states that she experienced depression, anxiety, fear, anger, difficulty sleeping, and other emotional trauma and distress. Plaintiff also states that she is entitled to punitive damages in order to punish Defendant for the wrongful conduct and to deter others from engaging in such conduct in the future.

The Court will first address Plaintiff's request for compensatory damages and then turn to punitive damages.

#### i. Compensatory Damages

The Court has reviewed the evidence in this case, including the testimony presented during the hearing. It is clear from the evidence that Plaintiff experienced a traumatic event. As Plaintiff testified at the hearing, Defendant began sending Plaintiff inappropriate text messages and requesting sexually explicit pictures. Given that Defendant was Plaintiff's probation officer, Plaintiff felt compelled to comply with his requests. Thereafter, Defendant arrived at Plaintiff's

9

home when she was all alone, wearing his badge and possessing a gun. He searched through her house to ensure that no one else was home and demanded that Plaintiff delete the text messages exchanged between them. Defendant then demanded Plaintiff perform oral sex on him. Plaintiff felt that she had no choice but to comply with his command. The Court finds Defendant's conduct egregious.

Plaintiff does not offer any proof on economic damages but instead requests compensatory damages for her emotional distress. "Emotional distress, of course, is undisputedly compensatory." *Trinidad v. City of Bos.*, No. CIV.A. 07-11679-DPW, 2011 WL 915338, at *5 (D. Mass. Mar. 15, 2011). With respect to the emotional distress Plaintiff described at the hearing, the Court finds Plaintiff to be a credible witness. In describing this experience, Plaintiff's facial expressions, tone of voice, and manner were convincing when she recounted the incident and the emotional distress it caused. *See Rogers v. Cofield*, No. 08-CV-10684-MBB, 2011 WL 6140974, at *30 (D. Mass. Dec. 8, 2011) (stating that the jury could have found plaintiff suffered a considerable amount of emotional pain and suffering, explaining that plaintiff's facial expressions, tone of voice, and manner were convincing). Plaintiff testified that she went to the emergency room at Methodist Hospital for a severe anxiety attack and that the providers had to sedate her. Plaintiff testified that she also sought treatment at Cherokee Health Systems and was diagnosed with PTSD. *See* [Ex. 1]. Her medical records support her testimony. [Ex. 1]. The incident clearly affected Plaintiff's mental wellbeing.

Further, the Court notes that the incident caused Plaintiff to engage in troubling behavior. From 2012 to 2017, Plaintiff maintained a job, was drug free, and maintained good relationships with her family, including her children. After the incident, Plaintiff lost her job, she relapsed, she lost her house, and her relationships with her family became strained and later non-existent. As Plaintiff testified at the hearing, she lost everything.

10

The Court finds Plaintiff is entitled to compensatory damages, but the Court finds Plaintiff's request for $10 million excessive. In recommending a compensatory damages award, the Court has considered the evidence in the record in addition to analogous cases, which serve as useful guideposts in determining the appropriate amount of damages to award in this case. *Doe v. Whitebread*, No. CV 3:15-1165, 2017 WL 590272, at *4 (M.D. Pa. Feb. 14, 2017) ("Many courts methodically collect and compare similar cases to establish the appropriateness of the award.") (collecting cases).

As one case explained:

> Courts awarding compensatory damages for—usually multi-incident—sexual assault and rape of inmates or detainees by prison guards and corrections officers have ranged from $100,000 to $500,000. There are also a handful of cases that involve a single incident of rape or sexual assault by an on-duty, uniformed law enforcement officer who preyed upon his victim by either effectuating a traffic stop, offering a ride to a lone woman, or taking advantage of a woman who sought the officer's assistance. These cases generally resulted in lesser damage awards, ranging from $50,000 to $350,000, than those sexual assaults and rapes that took place in the custodial context.

*Trinidad,* 2011 WL 915338, at *6 (collecting cases); *see also Whitebread*, 2017 WL 590272, at *4 ("Based on a review of cases involving officers assaulting members of the community or arrestees, which the court finds comparable to the plaintiff's case, the range of awards for emotional damages begins at $25,000.00 and in one case reached $750,000.00").

In the instant matter, the Court recommends that Plaintiff be awarded $250,000 in compensatory damages. In making this recommendation, the Court has considered how the incident has affected Plaintiff's mental health and her life. Plaintiff supported her testimony with medical records showing that she experienced severe anxiety and post-traumatic stress. *Compare Whitebread*, 2017 WL 590272, at *5 (awarding $100,000 in compensatory damages against an officer defendant who engaged in sexual intercourse with plaintiff without her consent, explaining

11

"plaintiff has not submitted medical records or other expert reports to clarify the extent of her emotional damages"). Further, Plaintiff explained how the incident affected her life. Plaintiff lost her job, relapsed, and lost her home. Her behavior negatively affected her relationship with her family. Plaintiff's testimony of how the incident affected her was also supported by McPeters's and Coria's testimonies.

The Court also notes that this amount represents that the "incident, while disgusting and egregious, was a singular, isolated incident." *Id.* The Court has also considered Defendant's actions in demanding that Plaintiff provide him with sexually explicit pictures. The Court finds that $250,000 appropriately compensates Plaintiff. *Mize v. Tedford*, No. 08-CV-10660-DT, 2009 WL 1508375, at *3 (E.D. Mich. May 29, 2009), *aff'd,* 375 F. App'x 497 (6th Cir. 2010) (awarding plaintiff $350,000 against a uniformed police officer who forcibly raped her)*; see also Etters v. Shanahan,* No. 5:09-CT-3187-D, 2013 WL 787344 (E.D.N.C. 2013) (awarding $100,000 in compensatory damages to an inmate who was raped, assaulted, and harassed by Department of Corrections official following entry of default judgment); *Ortiz v. Lasker,* 2010 WL 3476017 (W.D.N.Y. 2010) (plaintiff inmate raped by corrections officer awarded $250,000 in compensatory damages based on testimony of plaintiff and her husband, as well as medical records, suggesting plaintiff suffered from nightmares, PTSD, anxiety, difficulty with intimate relationships, and mood swings as a result of the rape).

While the Court has considered Plaintiff's request for $10 million, the Court cannot find any cases, and Plaintiff has not cited any, where a similar amount was awarded under similar circumstances. Accordingly, the Court **RECOMMENDS** Plaintiff be awarded compensatory damages in the amount of $250,000.00.

### ii. Punitive Damages

As mentioned above, Plaintiff requests $15 million in punitive damages. While the Court

finds punitive damages appropriate in this case, the Court declines to recommend an award of $15 million.

"Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or desire to injury. *Williams v. Lake*, No. 1:13-CV-627, 2014 WL 5211430, at *2 (S.D. Ohio Oct. 14, 2014) (quoting *Hagge v. Bauer,* 827 F.2d 101,110 (7th Cir. 1987)). In Tennessee, a court may "award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992).

The Court finds that punitive damages are appropriate given Defendant's willful and intentional actions against Plaintiff. As explained above, Defendant, as Plaintiff's probation officer, seriously abused his authority. First, Defendant made Plaintiff send him sexually explicit pictures. Then, Defendant came into Plaintiff's home wearing his badge and carrying his gun and commanded that Plaintiff perform oral sex on him. The Court finds punitive damages in the amount of $250,000 to be appropriate under the circumstances. The Court finds such an award will punish Defendant for his abhorrent behavior while at the same time deter others from engaging in similar conduct. While the Court has considered Plaintiff's request for $15 million, Plaintiff has not pointed the Court to any cases awarding a similar amount under similar circumstances, and the Court finds such an award excessive. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 (1996) ("In order to be deemed constitutional, a punitive award cannot be "grossly excessive.").

### C. Attorney's Fees

Finally, Plaintiff has requested attorney's fees in the total amount of $74,256.25, subject to any enhancement the Court finds appropriate. The Court finds that Plaintiff is the prevailing party in this matter and is entitled to attorney's fees pursuant to 42 U.S.C. § 1988 (explaining that the

13

Case 3:18-cv-00039-CLC-HBG   Document 62   Filed 02/24/21   Page 13 of 17
PageID #: 511

court may in its discretion award a reasonable attorney's fees for § 1983 actions). Thus, the remaining question is whether the requested attorney's fees are reasonable.

In making a determination of reasonableness, courts often employ the "lodestar method," which is "the proven number of hours reasonably expended on the case by the attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). The reasonableness of the hours and the rate is determined by considering twelve factors:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

*Id.* at 415-16. The most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Id.* at 416 (quoting *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)).

The Court has reviewed the hourly rates in this case and finds them to be unreasonable for this District. In determining the appropriate hourly rate to apply, the district court must consider the prevailing market rate in the relevant community, which for fee purposes, is the legal community within the Court's territorial jurisdiction or venue. *Brooks v. Invista*, No. 1:05-cv-328, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008) (citing *Adcock-Ladd v. Sec'y of the Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)). The appropriate or reasonable hourly rate "may not, however, exceed the amount necessary to cause competent legal counsel to perform the work required." *Id.* (citing *Coulter v. Tennessee*, 805 F.2d 146, 148 (6th Cir. 1986), *abrogated on other grounds by*, *The Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686 (6th Cir. 2016)).

The Court of Appeals has explained this distinction well:

> The statutes use the words "reasonable" fees, not "liberal" fees.

14

> Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate.

*Coulter*, 805 F.2d at 149; *see also Lamar Adver. Co. v. Charter Township of Van Buren*, 178 F. App'x 498 (6th Cir. 2006) ("Even if it would be reasonable to award [plaintiff] $370 per hour, the record supports the district court's conclusion that $200 per hour is sufficient to encourage competent lawyers in the relevant community to undertake legal representation.").

In the instant matter, Plaintiff's attorneys have presented hourly rates from $300 for associates and $525 for members.[4] The Court finds the requested hourly rates unreasonable for this District. *See EEOC v. Dolgencorp*, 277 F. Supp. 3d 932 (E.D. Tenn. 2017), *aff'd*, 899 F.3d 428 (6th Cir. 2018) (awarding $350 per hour for an attorney with twenty-four years of experience, $250 per hour for ten years of experience, and $95 per hour for a paralegal*); Vanderhoef v. Dixon*, No. 3:16-CV-508-TAV-DCP, 2020 WL 6864543, at *6 (E.D. Tenn. May 4, 2020), *report and recommendation adopted*, No. 316CV00508TAVDCP, 2020 WL 4673464 (E.D. Tenn. Aug. 12, 2020) ("[T]he Court notes that it has awarded fees upward of $350 for other experienced civil rights attorneys."); and *Herring v. SCI Tennessee Funeral Servs., LLC*, No. 2:15-CV-00280, 2018 WL 2406008, at *6 (E.D. Tenn. May 4, 2018) (awarding $350 for an attorney with eighteen years of experience and $300 per hour for an attorney with fifteen years of experience and $90 per hour for a paralegal who had worked for the firm for twenty-four years), *report and recommendation adopted*, 2018 WL 2407192 (E.D. Tenn. May 24, 2018).

Plaintiff states that the hourly rates presented are below the hourly rates awarded in similar

---

[4] Plaintiff's attorneys did not provide any information on their professional experience justifying such rates. The only information the Court has in the record is that several of the attorneys are members of the law firm and other attorneys are associates.

complex matters in federal court, but Plaintiff does not provide the Court with any citations to support her argument. Accordingly, the Court **RECOMMENDS** that $365 per hour be awarded to the members, $265 per hour be awarded to the associates, and $125 per hour be awarded to the paralegal.[5] The Court finds these hourly rates are more consistent with previous awards and account for the passage of time. *Van Horn v. Nationwide Pro. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011) (explaining that a district court may look to "a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests").

The Court has also reviewed the time expended in this matter (i.e., 196.75 hours). The Court will not recommend a reduction on the hours expended in this case given that the number of hours is unchallenged, the hours reasonably reflect the work conducted in this case (i.e., drafting the Complaint, legal research, litigating the motion to stay and reviewing the subsequent, related filings, and pursuing the entry of default and default judgment). Further, Plaintiff states that the time spent litigating the motion to dismiss filed by the other Defendants was removed from the instant request. Accordingly, the Court **RECOMMENDS** that Plaintiff be awarded $60,863.75 in attorney's fees.

## V. CONCLUSION

Based upon these findings and taking all well-pleaded actions in the Complaint as true as they relate to Defendant, the undersigned **RECOMMENDS**[6] as follows:

---

[5] The Court notes that Attorney Jeffrey Zager became a member of the firm on January 2021, but it does not appear he performed any work on this matter when he became a member. Thus, the Court will recommend the associate rate of $265 per hour for Attorney Zager.

[6] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need

16

Case 3:18-cv-00039-CLC-HBG   Document 62   Filed 02/24/21   Page 16 of 17
PageID #: 514

1. Plaintiff's Application for Default Judgment Against Defendant Bryant Lamont Thomas [**Doc. 54**] be **GRANTED IN PART AND DENIED IN PART**;

2. That Defendant be **ADJUDGED** for violating 42 U.S.C. § 1983 and committing assault and battery; and

3. That Plaintiff be awarded $250,000 in compensatory damages, $250,000 in punitive damages, and $60,863.75 in attorney's fees.

Respectfully submitted,

_____
United States Magistrate Judge

---

not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).